

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AMERICAN NEEDLE, INC., | ) |
| Plaintiff, | ) |
| vs. | ) No. 04 C 7806 |
| NEW ORLEANS LOUISIANA SAINTS, et al., | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff American Needle, Inc. (American Needle) brought this antitrust action against defendants, the National Football League (NFL), the individual owners of the NFL's member teams, National Football League Properties, Inc. (NFLP) and Reebok International, Ltd. (Reebok), for violation of the Sherman Act, 15 U.S.C. § 1 *et seq.* Defendants move to dismiss the complaint for failure to state a claim. The motion is granted in part and denied in part.

## BACKGROUND

The following facts, taken from plaintiff's complaint, are, for purposes of this motion, accepted as true. American Needle, a corporation headquartered in Buffalo Grove, Illinois, designs, manufactures, and sells headwear carrying the trademarked names and logos of various professional athletic teams. The NFL is an unincorporated association of professional football teams and their owners. The NFLP is a Delaware corporation established by the NFL and its member teams to license their trademarks. For many years, American Needle and other clothing manufacturers were licensed by the NFLP to use NFL teams' trademarks on their headwear and apparel. However, in December 2000, the NFL, NFLP and NFL team owners decided to change their licensing practices for the use of trademarks on headwear and

apparel – no longer would various manufacturers compete for licenses, nor would the NFLP grant multiple licenses. Instead, the NFLP would enter into an exclusive licensing agreement with one company for the manufacture, sale, and distribution of headwear and apparel carrying the trademarks of the NFL and its member teams. Subsequently, the NFLP entered into an exclusive licensing agreement with Reebok. American Needle's trademark license with the NFLP expired in March 2001 and was not renewed.

Plaintiff filed a five-count complaint on December 1, 2004, alleging that defendants' agreement to grant an exclusive license for the use of NFL teams' trademarks on headwear and apparel constitutes a monopolization, a conspiracy to monopolize, and an attempt to monopolize various markets (counts I-III), in violation of section 2 of the Sherman Act, 15 U.S.C. § 2. Plaintiff also contends that the agreement constitutes a restraint of trade under the *per se* rule and the rule of reason (counts IV and V), in violation of section 1 of the Act.

## DISCUSSION

A Federal Rule of Civil Procedure 12(b)(6) motion to dismiss tests the sufficiency of the complaint, not the merits of the case. <u>Triad Assocs., Inc. v. Chicago Hous. Auth.</u>, 892 F.2d 583, 586 (7th Cir. 1989). In deciding a motion to dismiss, the court must assume the truth of all well-pleaded allegations, making all inferences in the plaintiff's favor. <u>Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund</u>, 25 F.3d 417, 420 (7th Cir. 1994). The court should dismiss a claim only if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957).

Counts IV and V of plaintiff's complaint allege violations of section 1 of the Sherman Act, which states: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign

nations, is hereby declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony." 15 U.S.C. § 1. Counts I, II and III of plaintiff's complaint allege violation of section 2 of the Sherman Act, which states that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony." 15 U.S.C. § 2.

In their motion to dismiss, defendants argue that plaintiff's claims for violations of the Sherman Act require it to identify the relevant market in which they have restrained and monopolized trade. *See, e.g.*, Elliot v. United Center, 126 F.3d 1003, 1004-05 (7th Cir. 1997); Menasha Corp. v. News America Marketing In-Store, Inc., 238 F.Supp.2d 1024, 1032 (N.D.Ill. 2003). Defendants assert that plaintiff has failed to identify such a relevant market. Plaintiff first maintains that even if this were true it would not defeat count IV because it states a claim for a *per se* violation of the Sherman Act and therefore does not require the identification of a relevant market.

The complaint alleges that the 32 professional football teams that constitute the NFL agreed to restrict the use of their intellectual property, opting to allow the NFLP to control it, and that the NFLP agreed to grant Reebok an exclusive license to use the trademarked names and logos of NFL teams on headwear and apparel. Plaintiff claims that this constitutes horizontal price-fixing and a group boycott, *per se* violations of the Sherman Act, which necessarily results in decreased output and/or supra-competitive prices. In their reply, defendants counter that a *per se* standard is inapplicable to the NFLP's agreement with Reebok because agreements involving members of sports leagues must be analyzed under the

rule of reason and these agreements cannot be labeled a group boycott or price-fixing. We agree that the *per se* rule does not apply to defendants' actions.

Over a century ago the Supreme Court established that section 1 of the Sherman Act outlaws only unreasonable restraints of trade. <u>United States v. Joint-Traffic Association</u>, 171 U.S. 505 (1898); *see* <u>Arizona v. Maricopa County Medical Society</u>, 457 U.S. 332, 343 (1982). Thus, to determine whether a restraint of trade violates antitrust law, courts employ the rule-of-reason test, "taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." <u>State Oil Co. v. Khan</u>, 522 U.S. 3, 10 (1997). Because of the costs of the rule-of-reason test, courts have employed a *per se* rule to establish illegal restraint, where prior experience allows the court to reach a conclusive presumption that the restraint has a "predictable and pernicious anticompetitive effect" and "limited potential for procompetitive benefit." *Id.*; <u>Maricopa County</u>, 457 U.S. at 343. Courts do not employ the *per se* rule unless the effect of the restraint of trade is obvious. <u>Continental T.V., Inc. v. GTE Sylvania Inc.</u>, 433 U.S. 36, 49-50 (1977)("Per se rules of illegality are appropriate only when they relate to conduct that is manifestly anticompetitve.").

The Supreme Court has rejected the *per se* rule when reviewing trade restraints imposed by sports leagues. <u>NCAA v. Board of Regents of the University of Oklahoma</u>, 468 U.S. 85, 100-101 (1984). In <u>Board of Regents</u>, members of the National Collegiate Athletic Association (NCAA) challenged the association's restraints on the sale of television broadcast rights. *Id.* Though the Supreme Court had found similar restraints to be illegal *per se* in other circumstances, it did not apply the *per se* rule but, rather, analyzed the restraints under the rule of reason. The court jettisoned the *per se* rule in that case because it involved "an industry

in which horizontal restraints on competition are essential if the product [college football] is to be available at all." *Id.* In order to offer intercollegiate athletic competition, the NCAA required joint cooperation and conformity to rules. *Id.* Furthermore, the court found that many NCAA restraints resulted in a pro-competitive effect on the association's members, thus a fair evaluation of the restraints required consideration of the NCAA's justification for the regulations. *Id.* at 103.

Since the Supreme Court's decision in Board of Regents, courts have repeatedly rejected the *per se* rule when analyzing a trade restraint imposed by a sports league, opting instead for the rule of reason. *See, e.g.*, Chicago Professional Sports Limited Partnership v. NBA, 961 F.2d 667, (7th Cir. 1992)(reviewing NBA's restriction on television broadcast rights under the rule of reason); National Hockey League Players' Association v. Plymouth Whalers Hockey Club, 325 F.3d 712, 719 (6th Cir. 2003)(reviewing hockey league's limitation on the eligibility of "overaged" players under rule of reason); Law v. NCAA, 134 F.3d 1010, 1019 (10th Cir. 1998)(stating that since athletic league competition requires horizontal agreements, "all horizontal agreements among NCAA members, even those as egregious as price-fixing, should be subject to a rule of reason analysis."); *see also* Overview: Looking Ahead at Sports and the Antitrust Law, 14 Antitrust 15, 16 (Spring 2000)("[I]t is now settled that the practices typically associated with the organization of professional sports leagues and other organizations such as the NCAA are not subject to the per se rule."). Thus, even if plaintiff's allegations describe a trade restraint that has been held unlawful, *see* Denny's Marina, Inc. v. Renfro Productions, Inc., 8 F.3d 1217, 1220 (7th Cir. 1993)("[A] horizontal price-fixing conspiracy . . . is *per se* an unreasonable restraint of trade."), a *per se* claim for violation of section 1 of the Sherman Act is inappropriate against the NFL.

Our analysis of section 1 of the Sherman Act does not end, however, because plaintiff also alleges a violation of the section based on the rule of reason. To determine whether a trade restraint runs afoul of antitrust law under the rule of reason, a court must determine the consequences of the restraint on the affected market. *See* Havoco of America, Ltd. v. Shell Oil Co., 626 F.2d 549, 554 (7th Cir. 1980); *see also* 42nd Parallel North v. E. Street Denim Co., 286 F.3d 401, 404 (7th Cir. 2002). But, first, the relevant affected market must be defined. Adidas America, Inc. v. NCAA, 64 F.Supp.2d 1097, 1101(D. Kan. 1999)("The first step in an antitrust analysis is defining the relevant market or markets."). Likewise, claims of monopolization of trade under section 2 of the Sherman Act also require a determination of the relevant market. U.S. v. Grinnell Corp., 384 U.S. 563, 571 (1966); Bernard Food Industries, Inc. v. Dietene Co., 415 F.2d 1279, 1284 (7th Cir. 1969)("A definition of the relevant market is an essential element of a violation under Section 2 of the Sherman Act.")(superseded by statute on an unrelated issue). Defendants assert that plaintiff has failed to identify a legitimate market on which it can base its remaining claims.

Plaintiff alleges that defendants' conduct has affected six relevant markets: (1) the market for licenses to use NFL and NFL teams' trademarks in the design, manufacture and sale of apparel, (2) the market for licenses to use these trademarks in the design, manufacture and sale of headwear, (3) the wholesale market for the sale and distribution of apparel with these trademarks, (4) the wholesale market for the sale and distribution of headwear with these trademarks, (5) the market for the manufacture of apparel with the NFL and NFL teams' trademarks, and finally, (6) the market for the manufacture of headwear with these trademarks. Defendants argue that none of these alleged markets, which are all defined by the use of trademarks, can support plaintiff's antitrust claims because market definitions

contingent on trademarks are inadequate as a matter of law. In addressing defendants' argument, we do not determine whether or not the facts support plaintiff's market definitions, but only determine whether the law will permit the sort of market definitions alleged. Rohlfing v. Manor Care, Inc., 172 F.R.D. 330, 345 (N.D.Ill. 1997).

A relevant market is composed of products whose use is interchangeable and for which there is a "cross-elasticity of demand." Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962); United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 394-95 (1956)(stating that a relevant market consists of "commodities reasonably interchangeable by consumers for the same purposes."). In some cases, the relevant market for an antitrust action may be a distinct portion, or submarket, of a broader market. Brown Shoe Co., 370 U.S. at 325. To determine whether there is a distinct product submarket, courts look to "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.* Regardless of whether the relevant market is properly viewed as a submarket, a plaintiff may not limit a market definition by excluding reasonable product substitutes in order to establish an unreasonable restraint or a monopolizing effect on the market. Adidas America, Inc., 64 F.Supp.2d at 1102. Incomplete or improperly circumscribed market definitions effectively write the market requirement out of antitrust law.

For this reason, courts have repeatedly rejected markets that are defined by a company's trademark. *See, e.g.*, Generac Corp. v. Caterillar Inc., 172 F.3d 971, 977 (7th Cir. 1999)("Product markets are not defined in terms of one trademark or another."); Tunis Bros. Co., Inc. v. Ford Motor Co., 952 F.2d 715, 723-24 (3d Cir. 1991)(collecting cases); Shaw v.

Rolex Watch, U.S.A., Inc., 673 F.Supp. 674, 678 (S.D.N.Y. 1987)(collecting cases).[1] In these cases, parties have attempted to define a market based on a product's trademark, excluding interchangeable substitutes and ignoring the consumers' "cross-elasticity of demand" for products that serve a similar purpose. For example, in Generac Corp., the Seventh Circuit found that the proper market in which to analyze Caterpillar's allegedly anti-competitive activity was not Olympian-trademarked generator sets, but all generator sets. Id. at 977. The court explained that trademarks do not distinguish separate markets because they "simply identify the origin of a product." Id. It further noted that "[n]ot even the most zealous antitrust hawk has ever argued that Amoco gasoline, Mobil gasoline, and Shell gasoline are three separate product markets." Id. Even a prestigious trademark, such as Mercedes-Benz "protects only the name or symbol of the product. Market power, if any, is derived from the product, not from the name or symbol as such." Mozart Co. v. Mercedes-Benz of North America, Inc., 833 F.2d 1342, 1346 (9th Cir. 1987).

Yet, the analysis from these trademark cases cannot be readily applied to the facts of the instant case. The trademarks integral to plaintiff's market definitions – the names and logos of the NFL and its member teams – do not serve to "identify the origin" of the products that carry them. (The tag reading Reebok, as opposed to Nike or Adidas or Champion or American Needle, serves the generally accepted purpose of trademarks, informing the customer of the origin of the apparel and perhaps revealing something to the customer about its quality. But neither Reebok's trademark, nor that trademark's purpose, is relevant to our

---

[1] Nonetheless, courts have not foreclosed the possibility that under certain circumstances a well-defined, distinct market could consist of just one brand of a product. See U.S. Anchor Mfg., Inc. v. Rule Industries, Inc., 7 F.3d 986, 998 (11th Cir. 1993)("A single branded product may, in rare cases, constitute its own relevant market.")(citing Los Angeles Memorial Coliseum Commission v. NFL, 726 F.2d 1381, 1393 (9th Cir.), cert. denied, 469 U.S. 990 (1984)); Tunis Bros. Co., Inc., 952 F.2d at 723.

inquiry.) Nor is it clear that these NFL trademarks "protect only the name or symbol of the product." The NFL team names and logos that appear on apparel and headwear are not a "symbol" of the T-shirt or cap on which they appear. In fact, the NFL teams' trademarks carried on a T-shirt or cap may be more properly viewed as the product itself, rather than the T-shirt or cap.[2]

In Generac, the Seventh Circuit recognized the absurdity in claiming that one brand of gasoline was not interchangeable with another, and therefore constituted its own separate market. The same would be true in claiming that one brand of t-shirt or cap could not substitute for another brand. However, we must acknowledge that some portion of the market for headwear and apparel carrying NFL teams' trademarks has little to do with the items carrying the logos. Certainly some people purchase a shirt or hat with an NFL team's logo simply because they need a shirt or a hat. As defendants argue, apparel with a different logo or with no logo would serve as a reasonable substitute for these consumers. But, just as certainly, a significant segment of the market for NFL-branded headwear and apparel is purchasing the team logo. If a store sold out of hats carrying the Chicago Bears logo, these individuals would not necessarily find caps carrying logos for Spongebob, the University of Michigan, or even the Chicago Bulls to be reasonable substitutes. More likely, they would purchase a different item of apparel, such as a T-shirt or sweatshirt, or even a non-apparel item like a mug or key chain that carries the Bears logo. The product for these consumers is the trademarked logo. This is not the case with the trademarks Pine-Sol, Olympian, Rolex, or

---

[2]This is in contrast to the purpose of the NFL trademarks discussed in Weber v. National Football League, 112 F.Supp.2d 667 (N.D.Ohio 2000). In Weber, the plaintiff attempted to define a market around Internet domain names employing the trademarked names of NFL teams. The exact purpose of a domain name is to identify the origin and represent the content of the Internet site for which it serves as an address. Thus, the use of an NFL team name in a domain name does serve as a symbol of the product and the content one would find at that address.

Shell. Though customers may prefer those brand names for any number of reasons, what they are buying is a disinfectant household cleaner, Clorox Co. v. Sterling Winthrop, 117 F.3d 50 (2d Cir. 1997), an electric generator, Generac Corp., 172 F.3d at 971, a high-end watch, Shaw, 673 F.Supp. at 674, or gasoline, Chawla v. Shell Oil Co., 75 F.Supp.2d 626, 642 (S.D.Tex. 1999), all of which have reasonable substitutes under other brand names. But for many people purchasing headwear or apparel with an NFL team's logo, they are purchasing the ability to be identified with a particular team – the right to be recognized as a fan. Defendants state that "Relevant markets include not just brands that consumers may prefer but all alternatives to which consumers could 'practicably turn' if 'prices become anticompetive.'" For consumers seeking to wear something in support of an NFL team, what is the alternative to which they can practically turn if the NFLP's exclusive contract with Reebok allows this headwear and apparel to become anticompetitve?

Defendants cite Carell v. Shubert Organization, Inc., 104 F.Supp.2d 236 (S.D.N.Y. 2000), to support their contention that a market narrowly defined by a product's trademark does not suffice for an antitrust claim. Unlike the other cases cited above, Carell involves trademarks which do not simply serve to identify the origin of a product. In Carell, a make-up designer claimed that the producers of the musical *Cats* had monopolized the market for intellectual property rights related to the show. *Id.* at 241. The court denied plaintiff's antitrust claim because there was no plausible basis on which to find that *Cats*-related makeup designs and other intellectual property was a market unto itself. *Id.* at 264. The court explained that customer preference for *Cats*-related products did not create a market unto itself, just as consumers' choice of Pepsi, NBC or TWA, over their respective competitors, does not establish each of their branded products as its own market. *Id.* at 265 (quoting Global

Discount Travel Services v. Trans World Airlines, Inc., 960 F.Supp. 701, 705 (S.D.N.Y. 1997)). The court also found no reason why "products associated with other Broadway shows or other forms of entertainment are not reasonably interchangeable with products associated with *Cats*." *Id.* at 265. But it is not customers' preference for headwear and apparel carrying NFL teams' names and logos that would establish it as a separate market, it is the lack of reasonably interchangeable products. Declining to recognize a separate market for *Cats*-related products is more akin to declining to find a separate market for Chicago Bears-related headwear and apparel, than for all NFL-related headwear and apparel. Just as there are other Broadway plays and musicals, there are other NFL teams. However, we are not considering whether headwear and apparel carrying one NFL team's logo constitutes its own market, we are considering whether, as a matter of law, all headwear and apparel carrying NFL team logos cannot constitute a market unto itself. Both the Supreme Court and the Seventh Circuit have held in a different context – the realm of television, not textiles – that the distribution of sports-related intellectual property can be a market unto itself.

In Board of Regents, 468 U.S. at 111, the Supreme Court found that the district court properly held that college football broadcasts constituted their own market. Since the audience for these broadcasts was "uniquely attractive," advertisers and broadcasters did not have reasonable alternatives for this product. *Id.* Hence, the Supreme Court held that the NCAA had monopoly power over a product without substitutes on the market. *Id.* at 112. Three decades earlier, the Court held that the even-narrower market for the promotion of championship boxing contests was separate from the market for all professional boxing events. International Boxing Club of New York, Inc. v. United States, 358 U.S. 242, 250-51 (1959). Acknowledging that a "market is composed of products that have reasonable

interchangeability for the purposes for which they are produced – price, use and qualities considered," the court held that championship boxing contests were sufficiently separate from boxing contests in general because, among other reasons, they were uniquely attractive to fans. *Id.* at 250 (quoting United States v. E.I. du Pont de Nemours & Co., 351 U.S. at 404); Board of Regents, 468 U.S. at 112.

The Seventh Circuit also found that a sport's television broadcasts constitute their own market, though the court's reasoning varied from that in Board of Regents. *See* Chicago Professional Sports Limited Partnership v. NBA, 961 F.2d 667, 673-74 (7th Cir. 1992). In Chicago Professional Sports, the owners of the Chicago Bulls and the television station, WGN, brought an antitrust action against the NBA alleging that its cap on the number of televised games was illegal. *Id.* at 669. The NBA argued that its basketball broadcasts were a small fraction of all television entertainment, or even all televised sports, and therefore its restraints had a minimal impact on the overall market. *Id.* at 673. Although the Seventh Circuit did not find that the audience for NBA games distinguished a unique market for these broadcasts, it rejected the notion that the market could only be defined by the audience. Nor did it define the market as television entertainment or televised sports. *See id.* The court found that televised basketball games were the product and, therefore, caps on the number of games broadcast were a restraint on that product market.[3] *Id.* at 673-74.

Thus, in the case of a sport's broadcasts, whether a court looks to the broadcasts' audience or the product itself, it is a unique, separate market. Just as the Supreme Court and

---

[3] Though the markets in Board of Regents, 468 U.S. at 85, International Boxing Club, 358 U.S. at 242, and Chicago Professional Sports, 961 F.2d at 667, are more properly identified as "submarkets," this distinction is largely irrelevant since submarkets are legitimate markets for purposes of antitrust actions. Whether or not a market can be classified as a subset of another larger market does not impact the analysis if it is distinct enough to constitute its own legitimate market.

the Seventh Circuit distinguished televised collegiate football games and televised basketball games from the myriad of other television broadcasting, or even televised sports, so too could headwear and apparel carrying NFL teams' logos and other trademarks be distinguished from all other headwear and apparel, including headwear and apparel carrying one of the myriad of other possible logos, or even the logo of a non-NFL sports team. NCAA games draw a unique audience, and NBA games constitute a unique product. Therefore, the sale of the rights to televise them is a market unto itself. *See* Board of Regents, 468 U.S. at 112; Chicago Professional Sports, 961 F.2d at 673-74. The sale of television rights is a method for these sports associations to merchandise and promote their core product: the athletic competition in which their member teams engage. The sale of headwear and apparel branded with team logos is another method. If a unique, separate market exists for the television rights of NCAA football games and NBA basketball games, we do not see how, as a matter of law, a unique market cannot exist for the manufacture and distribution of merchandise carrying NFL trademarks.

Our analysis is limited to the issues raised in defendants' motion to dismiss. As pointed out above, we have not determined whether the markets plaintiff alleges do in fact exist, thereby supporting its claims. We have found only that the law does not preclude an antitrust claim based on such markets. Even though plaintiff's market definitions do not fail due to reliance on NFL trademarks, they may still be improper. As indicated in our analysis, if the true product in this case is NFL teams' logos, not the items that carry them, then there may be no justification for limiting the relevant market to headwear and apparel that carry these logos. Perhaps, the market would more properly include all merchandise carrying NFL logos. Of course, this broader market definition would then alter the impact of the exclusive contract

with Reebok, which is allegedly limited to the manufacture and distribution of headwear and apparel.[4]

Many questions concerning the viability of plaintiff's claims remain. For example, it is far from clear, for a different reason, that NFLP's control over the trademarks and logos is subject to the antitrust laws. The same reasoning that has led courts to reject the *per se* concept, when somewhat extended, can lead to the conclusion that the NFL should be viewed as a single source for the purpose of protecting the clubs' trademarks and logos. The league may be viewed much like a franchisor. The NFL may license others to use its trademarks and logos to affix to merchandise and apparel they make, just as McDonald's licenses its trademarks for use by others, who make hamburgers. The NFL may have as great an interest as McDonald's in protecting the good will inherent in their marks by selectively choosing who may use them. *See* Chicago Professional Sports Limited Partnership v. National Basketball Association. 95 F.3d 593, 599-600 (7th Cir. 1996). It is a rather dramatic assertion that the antitrust laws prohibit the NFL from determining who may use its trademarks and logos and, therefore, its good will. But we leave that consideration to another day, as the present contention is confined to whether or not there can be relevant markets. Given that plaintiff's market definitions are distinguishable from those that courts have found to be illegitimate due to their reliance on trademarks, and the fact that there is support in case law for distinguishing a separate market in this context, we deny defendants' motion to dismiss Counts I, II, III and

---

[4] Though it is not relevant to the inquiry before us and carries no weight at this stage in the litigation, it is worth noting that Reebok's 2004 Annual Report, contradicts the complaint's assertion that the company is "the exclusive provider of apparel and headwear bearing the Trademarks of the individual NFL Teams and the NFL." Reebok's Annual Report states that it has an exclusive right to manufacture and distribute NFL-branded replica jerseys, headwear, footwear and gloves and is the exclusive distributor of NFL-branded apparel and accessories in some distribution channels. However, it is "a non-exclusive distributor of NFL-branded apparel through catalogs, in retail stores that primarily carry NFL-branded products and in other retail channels."

V on the basis of improper market definitions.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss count IV is granted, and their motion to dismiss counts I, II, III and V is denied.

　　　　　　　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　JAMES B. MORAN
　　　　　　　　　　　　　　　　　　　　　　　　　　Senior Judge, U. S. District Court

_May 5_, 2005.