IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

AMERICAN NEEDLE, INC., )
)
Plaintiff, )
)
vs. ) No. 04 C 7806
)
NEW ORLEANS LOUISIANA SAINTS, )
et al., )
)
Defendants. )

## MEMORANDUM OPINION AND ORDER

Defendants, the National Football League (NFL), the individual owners of the NFL's member teams, National Football League Properties, Inc. (NFLP), and Reebok International, Ltd. (Reebok), move for partial reconsideration of this court's Memorandum Opinion and Order of May 5, 2005. In that decision, defendants' motion to dismiss count IV of plaintiff American Needle's complaint was granted, but their motion to dismiss counts I, II, III, and V was denied. Defendants now argue that the court erred by considering that headwear and apparel carrying NFL and NFL teams' logos may constitute a relevant market to support plaintiff's claims. They contend that the court should have only considered the market in licenses to use trademarks and logos.

Defendants correctly point out that there is a distinction between American Needles' input markets and outputs markets. In its complaint, American Needle alleges that there are six relevant markets: two are markets in which it is a buyer of licenses for trademarks (input markets), and four where it is the producer of products displaying those trademarks, which are sold to consumers (output markets). The court did not devote any attention in its prior

opinion to this distinction between plaintiff's alleged markets because it was irrelevant, given defendants' argument for dismissal. In their original motion to dismiss and subsequent briefs, defendants argued that none of plaintiff's alleged markets was a relevant market for antitrust claims because such markets could not be defined by trademarks. Defendants applied this broad argument to all of plaintiff's alleged markets – input and output markets alike. In the court's opinion it rejected defendants' contention that as a matter of law plaintiff's relevant markets could not be defined by trademarked logos.

Defendants present a different argument in this motion to reconsider. While before they argued that none of plaintiff's alleged markets was viable because they all relied on trademarks, which could never define a market, they now argue that American Needle can only allege a restriction, and therefore harm, in the input market, for licenses to use NFL logos, and that this is not a relevant market because there is a cross-elasticity with licenses for other logos. Rather than asking the court to reconsider its assessment of their previous arguments, defendants ask the court to consider this new argument. For the following reasons, we deny the motion for partial reconsideration.

Defendants argue that the NFLP's alleged exclusive contract with Reebok restricts the market for licenses to use the NFL's and NFL teams' trademarks. They further maintain that the contract does not affect plaintiff's output of products, *i.e.,* American Needle can still sell as many hats as it likes. Therefore, defendants argue, the only market relevant to the court's inquiry should be American Needle's input market, licenses for various trademarks and logos, not its output market, headwear and apparel.

In support of their argument, defendants cite Collins v. Associated Pathologists, Ltd., 844 F.2d 473 (7th Cir. 1988). In Collins, the plaintiff, a pathologist formerly employed by

Associated Pathologists, Ltd. (APL), brought an antitrust action against APL and St. John's Hospital. *Id.* at 474-75. APL contracted with St. John's to provide all of its pathology services. *Id.* at 475. As an APL employee, the plaintiff provided services for the hospital; however, after he was forced to resign, St. John's refused to hire him due to its contract with APL. *Id.* When determining whether APL's contract with St. John's was an unreasonable restraint of trade, the Seventh Circuit concluded that the relevant market to analyze was the market in which pathologists competed for jobs, not the market in which hospitals offered pathology services to their patients. *Id.* at 478-79.

The Seventh Circuit provided two reasons for this decision. First, the court held that a market of pathology services to hospital patients is not relevant because there is no distinct demand for pathology services separate from other hospital services. *Id.* at 478. In other words, the court found that a consumer market for pathology services did not exist and "[t]herefore the contract between St. John's and APL for the provision of pathological services could not have had an impact on patients." *Id.* The court stated that only hospitals and clinical laboratories could have been affected by the defendants' contract. *Id.*

The same does not hold true for the trademark licensing contract. There is a distinct demand for headwear and apparel carrying the logos of the NFL and NFL teams. As explained in our prior opinion, there is a basis to believe that for some consumers the NFL teams' logos are the "product," rather than the items carrying the logos. A contract which provides one company with an exclusive right to produce items carrying these logos may very well have an affect on the consumers who purchase them.

The second reason the Seventh Circuit limited the relevant market in Collins to the market in which pathologists compete for jobs was because of the Supreme Court's decision

in Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320 (1961), where a coal mining company entered into a contract to provide an electric power company in Tampa, Florida, with all of its required coal for twenty years. *Id.* at 322. Before the first shipment of coal, but after considerable investment by both parties, the mining company informed the utility company that the requirement contract violated antitrust laws and therefore it would not perform. *Id.* at 323. The utility sought coal elsewhere and sued for a declaration that the contract was valid. *Id.* at 323-24. The district and appellate courts held that the contract violated section 3 of the Clayton Act, 15 U.S.C. § 12 *et seq.*,[1] but the Supreme Court reversed. *Id.* at 324. The Supreme Court found that the lower courts had not properly considered the relevant market when determining whether the contract foreclosed competition in a substantial share of the line of commerce affected. *Id.* at 329-330. While the lower courts analyzed how the contract affected competition in the market for coal in peninsular Florida, the Supreme Court found that the relevant market was not so geographically narrow and that it should have been defined by the region in which the coal company and its competitors sold their coal. *Id.* at 331-32. Within this much larger geographic market the parties' coal contract had an insubstantial effect on the coal market. *Id.* at 332-33. In Collins, the Seventh Circuit relies on Tampa Electric Co. in finding that the only market relevant to the exclusive dealing contract between APL and the hospital is the market for pathologists. 844 F.2d at 478-79. The court points out that the Supreme Court never focused on the electricity company's energy market when considering the requirement contract's effect on competition. *Id.*

Defendants in the instant case argue that, as in Collins and Tampa Electric Co., we

[1] Though the case involved the Clayton Act and not the Sherman Act, the court's analysis of the relevant market is analogous to that in a case brought under the Sherman Act. Collins, 844 F.2d at 478 n.4.

should not consider the contract's effect on the output market. However, Collins and Tampa Electric Co. are significantly different from American Needle's action. The contract between the parties in Tampa Electric Co., as with the contract in Collins, had no apparent effect on competition in the output market. The Supreme Court does not note, and it is not evident, how Tampa Electric Co.'s source of coal would affect its customers' market for electric energy. It is not even clear from the opinion whether Tampa Electric Co.'s customers had any choice other than this public utility for their electricity service.

The same is not true of the NFLP's alleged contract with Reebok. It is readily apparent how restricting the issuance of licenses for the use of the NFL's and NFL teams' trademarked logos in the input market could directly affect the ability of consumers to purchase goods carrying the trademarked logos in the output market. For this reason, this case is distinct from those relied upon by defendants.

Two cases that were repeatedly cited in the court's prior opinion, NCAA v. Board of Regents of the University of Oklahoma, 468 U.S. 85 (1984), and Chicago Professional Sports Limited Partnership v. NBA, 961 F.2d 667 (7th Cir. 1992), provide greater insight into the relevance of input and output markets to this case. Their facts also bear more in common with this case than those cited by defendants. In Board of Regents and Chicago Professional Sports, the NCAA and NBA, respectively, restricted member teams' sale of broadcast rights of their games to television stations. In Chicago Professional Sports, WGN, the television station that wished to purchase the right to air more Chicago Bulls games, was also a plaintiff. 961 F.2d at 669. In these cases the NCAA and NBA were restricting an input market – the market of television rights available for broadcasters to purchase. The member teams complained that they missed out on revenues and publicity due to the restrictions, and in Chicago Professional

Sports, WGN likewise complained that it lost out on potential advertising revenues. Of course, WGN had many other options from which to choose in filling its programming schedule, just as American Needle has other licensing options for logos to put on its products. However, the courts' analyses in Board of Regents and Chicago Professional Sports did not consider only the directly restricted input market – the market in television rights – they also considered the output market – the market in televised games available to the viewing public. As the Supreme Court noted, "By restraining the quantity of television rights available for sale, the challenged practices create a limitation on output." Board of Regents, 468 U.S. 85, 99 (1984). Since the restriction on the input market creates such a direct effect on the output market, it is proper for the court to consider that market in its analysis. This direct link is also present in the instant case, making it more akin to Board of Regents and Chicago Professional Sports than Collins and Tampa Electric Co.

American Needle is in the same position as WGN in Chicago Professional Sports; it has a role as both a buyer and producer. *See* 961 F.2d at 670. Though the harm to WGN occurred in the market where it was the buyer of the television rights to Bulls games, the court considered the effect on the market in which WGN was the producer and the television viewers were the consumers. Likewise, the harm to American Needle results from its inability to obtain a license to use NFL and NFL teams' trademarks, but that does not preclude the court from considering how the NFLP's alleged exclusive contract with Reebok affects the consumers of the products carrying those trademarks – "the consumers that antitrust laws are supposed to protect." *See id.* at 669. While, as we previously noted, plaintiff's claim may face some daunting obstacles, the legal concept of a relevant market is not one of them.

## CONCLUSION

For the foregoing reasons, defendants' motion to reconsider is denied.

James B. Moran
JAMES B. MORAN
Senior Judge, U. S. District Court

June 6, 2005.