UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| AMERICAN NEEDLE, INC., ) | **PUBLIC REDACTED** |
| ) | **VERSION** |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Civil Action No. 04-CV-7806 |
| ) | |
| NEW ORLEANS LOUISIANA SAINTS, *et al.*, ) | Judge Sharon Johnson Coleman |
| ) | |
| Defendants. ) | Argument Date: August 27, 2013 |
| ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (CAUSATION)

Timothy B. Hardwicke
Michael J. Nelson
LATHAM & WATKINS LLP
233 South Wacker Drive, Suite 5800
Chicago, IL 60606
(312) 876-7700/*fax* (312) 993-9767
tim.hardwicke@lw.com/
michael.nelson@lw.com

*Counsel for Reebok International Ltd.*

Gregg H. Levy (*pro hac vice*)
Derek Ludwin (*pro hac vice*)
Leah E. Pogoriler (*pro hac vice*)
Ross A. Demain (*pro hac vice*)
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., N.W.
Washington, DC 20004
(202) 662-6000/*fax* (202) 662-6291
glevy@cov.com/dludwin@cov.com/
lpogoriler@cov.com/rdemain@cov.com

Richard Del Giudice
GOZDECKI, DEL GIUDICE, AMERICUS &
FARKAS LLP
One East Wacker, Suite 1700
Chicago, IL 60601
(312) 782-5010/*fax* (312) 782-4324
r.delgiudice@gozdel.com

*Counsel for the NFL Defendants*

April 1, 2013

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................ i

TABLE OF AUTHORITIES ....................................................................................................... ii

INTRODUCTION ....................................................................................................................... 1

BACKGROUND ......................................................................................................................... 3

    A.    The NFL's Decision To Significantly Reduce Its Licensee Base In The
         Face Of A Sharp Business Decline ......................................................................... 4

    B.    The NFL's Request For Proposals And Its Decision To Award Exclusive
         Headwear Rights To Reebok .................................................................................. 7

    C.    ███████████████████████ ............................................................ 9

    D.    American Needle's Non-Competitive Prior Performance As An
         NFL Licensee ....................................................................................................... 13

ARGUMENT .............................................................................................................................. 16

I.    Undisputed Evidence Establishes That Exclusivity Was Not The Cause Of
    American Needle's Asserted Injury. ...................................................................... 16

II.    American Needle Waived Any Rights That It Might Otherwise Have Had To
    Challenge The NFL's Decision Not To Renew Its Licenses. .............................. 20

CONCLUSION ........................................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Battaglia*,
   2011 WL 2038722 (N.D. Ill. May 24, 2011) ........................................................19

*Beaver v. Grand Prix Karting Ass'n*,
   246 F.3d 905 (7th Cir. 2001) ...............................................................................21

*Dedicated Transp., Inc. v. Volkswagen of Am., Inc.*,
   2001 WL 811657 (N.D. Ill. 2001) ........................................................................20

*Delapaz v. Richardson*,
   634 F.3d 895 (7th Cir. 2011) ...............................................................................19

*Goodman v. Hanson*,
   945 N.E.2d 1255 (Ill. App. Ct. 2011) ..................................................................21

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*,
   998 F.2d 391 (7th Cir. 1993) ..........................................................................17, 19

*Hampton v. Ford Motor Co.*,
   561 F.3d 709 (7th Cir. 2009) ...............................................................................21

*Keri v. Bd. of Trs. of Purdue Univ.*,
   458 F.3d 620 (7th Cir. 2006) ..........................................................................17, 19

*Landmark Props., Inc. v. Architects Int'l-Chi.*,
   526 N.E.2d 603 (Ill. App. Ct. 1988) ....................................................................21

*McDonald v. Vill. of Winnetka*,
   371 F.3d 992 (7th Cir. 2004) ..........................................................................17, 19

*O.K. Sand & Gravel v. Martin Marietta Techs.*,
   36 F.3d 565 (7th Cir. 1994) .......................................................................17, 18, 19

*Roger Whitmore's Auto. Servs. v. Lake Cnty., Ill.*,
   424 F.3d 659 (7th Cir. 2005) ...............................................................................20

*Valley Prods. Co. v. Landmark*,
   128 F.3d 398 (6th Cir. 1997) ...............................................................................16

**Other Authorities**

Fed. R. Civ. P. 56(c) ....................................................................................................20

Herbert Hovenkamp et al., IP AND ANTITRUST (2002) ..........................................16

## INTRODUCTION

American Needle, a former NFL licensee, challenges an exclusive headwear license awarded by the NFL to Reebok well over a decade ago.  Entering into an *exclusive* license is the only conduct that American Needle alleges to be unlawful.  But American Needle has no evidence that it would have obtained a headwear license "but-for" that challenged conduct—indeed, undisputed evidence establishes the opposite—and it thus cannot meet its burden to prove causation.

The challenged license followed an extensive review by the NFL of its licensed apparel business.  A variety of market changes had resulted in a substantial, well-documented decline in that business in the late 1990s.  In response, the NFL considered, among other things, whether to continue to issue a significant number of licenses, as it had in the past, for apparel companies to use League and club marks on consumer products.

The NFL concluded that in the new market environment, the multitude of licenses undermined any individual licensee's incentives to invest in marketing and promotion, as well as to improve the quality and appeal of its NFL-licensed products.  The NFL also recognized that, as a result, more innovative, fashion-conscious, and marketing-savvy competitors were taking away its business in branded apparel.  In response, in the fall of 2000, the NFL informed existing and prospective licensees that it was engaged in a comprehensive evaluation of its licensing business and that it was considering several alternative business models that differed significantly from the NFL's prior licensing approach.  In that context, the NFL invited proposals for new apparel licenses to take effect in 2002, with the goal of significantly reducing the number of its licensees.

At the time, the NFL viewed several other headwear licensees as more capable and competitive than American Needle. The NFL's contemporaneous evaluation concluded that American Needle (among other licensees) would never fit into the "primary" tier and that it should be deleted from the licensee base when its then-current licenses expired.



The NFL awarded Reebok licenses in several apparel categories. In some of those categories, including headwear, the license was exclusive. American Needle's headwear licenses (along with those of numerous other licensees) expired by their own terms.

Having failed to secure an exclusive headwear license through the competitive bidding process, American Needle now alleges that Reebok's exclusive rights in the headwear category violated the antitrust laws. In doing so, American Needle is alone among the dozens of disappointed bidders, including prominent headwear manufacturers such as New Era and Twins, whose licenses also expired without renewal.

There is no evidence—none—supporting a conclusion that American Needle would have received a headwear license if, in 2000, the NFL had decided *not* to award an exclusive license in the headwear category and had instead decided to enter into contracts with

two or even three headwear licensees. On this issue, as to which American Needle bears the burden, there is a total failure of proof. There are no documents; there is no fact testimony; and there is no expert testimony to support such a finding. Indeed, all of the extensive evidence, which we discuss at length at pages 9-16 below, is to the contrary.

Undisputed facts establish that American Needle failed to secure renewal of its headwear license not because the NFL decided to enter into an *exclusive* license, but rather because American Needle's ███ performance under its prior licenses were not competitive with those of other, more qualified bidders. Because American Needle cannot prove causation, defendants are entitled to summary judgment.

Summary judgment for the NFL Defendants is also warranted because American Needle waived any rights to object to the Reebok license. In responding to the NFL's request for proposals, American Needle, like all of the other bidders, agreed to its common terms of participation, including that the NFL was "under no obligation to grant you, nor any other company, a license" and that the NFL's "decision not to award a license to your company shall not give rise to any rights in favor of your company." Having knowingly participated in the bidding process under those terms, American Needle cannot complain that a different company received the exclusive license that it sought but failed to secure.

## BACKGROUND

The National Football League, an unincorporated association of 32 member clubs, produces professional football games.[1] The NFL promotes its entertainment product by licensing other companies to use League and club trademarks and logos on or in connection with

---

[1] The NFL, the 30 clubs named in the complaint, and NFL Properties ("NFLP") are referred to collectively herein as "the NFL Defendants" or "the NFL."

products that they sell. It does so through NFL Properties, which manages the licensing process on a centralized basis and seeks to protect and promote the NFL brand.[2]

A.     <u>The NFL's Decision To Significantly Reduce Its Licensee Base In The Face Of A Sharp Business Decline</u>

In the late 1990s, sales of sports-licensed apparel experienced a sharp decline.[3] The decline included NFL-branded headwear and other apparel.[4] Several major apparel licensees, including Starter and Pro Player, went bankrupt; many retail stores closed; and others sharply curtailed the floor space dedicated to NFL-licensed products.[5]

Against this backdrop and under the leadership of new executives with substantial experience in apparel marketing, the NFL conducted an intensive study of its apparel licensing

---

[2] Ex. 1, Declaration of Gary M. Gertzog, Dec. 21, 2005, ¶¶ 3-5, 16, 18, 21-24; Ex. 87, Deposition of Gary M. Gertzog, Oct. 27, 2006 at 161:13-20; Ex. 2, NFLP8072; *id.* at 8083-84. All exhibit citations are to the sequentially numbered exhibits attached to the declarations of Gary M. Gertzog, John T. Warren, Leah E. Pogoriler, and Kenneth G. Elzinga, contained in the Volume of Exhibits filed concurrently with this memorandum. For material facts as to which there is no genuine dispute, this memorandum cites both the Statement of Undisputed Material Facts ("SOF") and the associated record support. For facts included principally as background, this memorandum cites directly to the record.

[3] SOF 8; Ex. 88, Deposition of Gary M. Gertzog, Sept. 13, 2012 at 31:16-34:10; Ex. 89, Deposition of Roger Goodell, Sept. 14, 2012 at 11:3-15; Ex. 24 at NFLP9226-28; Ex. 83, *The Licensing Letter*, "Licensing Business Drops 1% As Music, Martha and Trademarks Nearly Offset Softness Elsewhere," Jan. 1, 2001, Vol. XXV, No. 1, p. 4; *see also* Ex. 89, Goodell Dep. 60:12-61:12, 77:18-78:5.

[4] SOF 8; Ex. 88, Gertzog Dep. 24:10-25:5, 31:16-34:10; Ex. 89, Goodell Dep. 11:3-15, 51:16-52:8, 77:18-78:5; Ex. 90, Deposition of Mark Holtzman, Sept. 13, 2012 at 87:5-89:7; Ex. 97, Deposition of John Warren, Sept. 21, 2012 at 143:9-17; Ex. 8 at NFLP8750; Ex. 24 at NFLP9226-28; Ex. 83, *The Licensing Letter*, "Licensing Business Drops 1% As Music, Martha and Trademarks Nearly Offset Softness Elsewhere," Jan. 1, 2001, Vol. XXV, No. 1, p. 4.

[5] Ex. 88, Gertzog Dep. 31:16-34:10, 119:3-120:1; Ex. 89, Goodell Dep. 11:3-15; ▮▮▮▮▮
▮▮▮▮▮ Ex. 53 at REEBOK102428 ("Can we earn back retail floor space from street brands, athletic apparel, private label?").

business.[6] In short, it concluded that the *status quo* was not working: As Gary Gertzog, then Senior Vice President of NFL Properties, explained, "our business was in sharp decline and [the] status quo was not a viable option for the NFL at that point in time." (Ex. 88, Gertzog Dep. 200:17-20.)

As a result, senior executives concluded that "we needed to find a new business model to reenergize the business." (SOF 8; Ex. 88, Gertzog Dep. 37:18-20, 200:17-20.) Commissioner Roger Goodell, then the Chief Operating Officer of the League, put it succinctly: "we knew we had to change our business." (SOF 8; Ex. 89, Goodell Dep. 25:3-26:4; *id.* at 25:10-23.) Those conclusions are confirmed in numerous contemporaneous documents.[7] For example, a presentation in 2000 by NFL executives to NFL owners stated that "[a] new approach is required to reverse the current apparel trends." (SOF 8; Ex. 24 at NFLP9226.)

The NFL's evaluation confirmed that the appeal of NFL-licensed apparel had diminished relative to fashion brands and other competing apparel products.[8] That was due in large part to the fact that, in light of the plethora of NFL-licensed manufacturers and distributors,

---

[6] SOF 8-10; Ex. 88, Gertzog Dep. 23:20-22 ("we engaged in a series of steps to comprehensively evaluate the licensed product business"), 23:23-25:5, 27:7-8 ("There was a comprehensive analysis of all aspects of our business . . ."); Ex. 89, Goodell Dep. 10:3-7, 25:10-26:4; Ex. 9, NFLP2213; Ex. 10, NFLP12860; Ex. 11, NFLP8021; Ex. 16, NFLP9219; Ex. 24, NFLP9225; Ex. 28, NFLP2391; Ex. 34 at NFLP8385-87.

[7] SOF 8; Ex. 8 at NFLP8750-54; Ex. 16 at NFLP9220-22; Ex. 23 at NFLP9854; Ex. 34 at NFLP8386-87; Ex. 42 at NFLP6535-37.

[8] Ex. 4 at NFLP9167 (discussing shifts in the apparel industry); Ex. 5 at NFLP9153-54 ("Sports licensed apparel is now receiving competition from [d]esigner names/brands . . . [a]thletic brands . . . [and h]ighly targeted niche companies" ); Ex. 7 at NFLP10610 ("Nike and Adidas . . . compete in the marketplace" and fashion brands "have successfully entered the 'sport' market"); Ex. 14 at NFLP9410-11 ("Fashion Sportswear companies" such as Nautica put marketplace pressure on sports apparel licensees); Ex. 34 at NFLP8386 ("a shift in consumer tastes away from sports licensed apparel towards more casual apparel . . . increased competition from fashion sportswear companies such as Abercrombie & Fitch, FUBU, and Tommy Hilfiger"); Ex. 41 at NFLP2868-69 (NFL product losing retail floor space; competition includes "other leagues and sports licensed companies").

none had an adequate incentive to innovate, to improve product quality, or to market and promote the NFL brand.[9]

The new models under consideration were intended to address that issue. As Mark Holtzman, a former Senior Vice President for the League's Consumer Products Division and now an executive with the New York Yankees, testified: "[W]e needed to get our partners to put more money into marketing the product, both from an advertising perspective and how it was presented at retail." (Ex. 90, Holtzman Dep. 135:22-136:2; *id.* at 115:1-10.) Mr. Gertzog explained that the NFL needed "licensees investing in the products, investing in fixturing in stores, investing in advertising and promotion, investing in creativity, [and] understanding market trends." (Ex. 88, Gertzog Dep. 143:11-15; *id.* at 134:4-22, 144:17-21.) Mr. Goodell described the need "to make sure we had partners who could invest in the business," and he emphasized to NFL owners that the new models under consideration "would result in stronger ties to defined business partners who would be responsible for marketing, producing, distributing, and selling NFL- and Club-licensed apparel." (Ex. 89, Goodell Dep. 27:22-24; Ex. 34 at NFLP8386.)

The NFL studied numerous alternative business models to address the problems with the *status quo*. Each contemplated significantly reducing, if not eliminating, the apparel licensee base:[10]

*Vertical integration*. The NFL considered taking in-house the licensees' role, manufacturing (or purchasing for resale) all of the products bearing League or club marks and

---

[9] Ex. 88, Gertzog Dep. 31:16-34:10, 134:13-22; Ex. 89, Goodell Dep. 11:3-21, 16:15-18, 29:22-30:3, 77:5-78:5; Ex. 97, Warren Dep. 92:4-16; Ex. 8 at NFLP8739; Ex. 34 at NFLP8386.

[10] *See generally, e.g.*, Ex. 88, Gertzog Dep. 23:19-24:9, 27:2-9, 200:16-24; Ex. 89, Goodell Dep. 31:20-32:7; Ex. 22, NFLP8922; Ex. 24 at NFLP9232-38 (assessing business models); Ex. 28, NFLP2391 (same); Ex. 30 at NFLP2799-808 (same).

logos. (SOF 9; Ex. 88, Gertzog Dep. 154:23-155:4; Ex. 24 at NFLP9233.) That model would have eliminated all apparel licensees. (*Id.*)

     *Joint venture*. The NFL considered joining with a single established major apparel company, such as Nike or Reebok, to create a new company to produce and distribute NFL-licensed apparel products. (SOF 9; Ex. 88, Gertzog Dep. 111:23-113:13, 116:15-117:6; Ex. 24 at NFLP9235; Ex. 34 at NFLP8386-87.) That alternative would have resulted in the elimination of all other apparel licensees.

     *Significantly reducing the licensee base*. Finally, the NFL considered many variations on the option of significantly reducing its licensee base.[11] These variations included granting exclusive rights to licensees by tier (*i.e.*, Pro Line, Team NFL, Game Day) and by product classification (*e.g.*, headwear, fleece, outerwear). (SOF 10; Ex. 88, Gertzog Dep. 200:16-24.)[12] This was seen as the "least restrictive" model, but still one that called "for a significant number of licensees to be reduced." (*Id.*)

    B.    <u>The NFL's Request For Proposals And Its Decision To Award Exclusive Headwear Rights To Reebok</u>

     The NFL informed its existing and potential licensees that it intended to make a significant change in its licensing business. Roger Goodell, then the League's Chief Operating Officer and now its Commissioner, testified that the NFL was "very open about the fact we were

_____

[11] SOF 10; *e.g.*, Ex. 89, Goodell Dep. 29:14-30:3, 77:5-8; Ex. 9 at NFLP2220 (paring down headwear licensee base); Ex. 10 at NFLP12868; Ex. 24 at NFLP9234.

[12] At the time, NFL-licensed apparel for adults—including headwear—was divided into three broad categories or tiers: "Pro Line" apparel was the highest quality, most authentic product, intended for sale in high-end department and sporting goods stores (*e.g.*, Nordstrom, Dick's); "Team NFL" apparel was better-quality product to be sold in mid-tier stores (*e.g.*, J.C. Penney and Kohl's); and "Game Day" apparel was good-quality product available to budget-conscious fans in discount stores (*e.g.*, Walmart) and similar retailers. (Ex. 88, Gertzog Dep. 86:19-87:9, 102:6-19; Ex. 90, Holtzman Dep. 15:13-23, 17:18-22, 42:1-12, 116:5-117:4, 174:18-20; Ex. 4 at NFLP9161-65, 69; Ex. 8 at NFLP8765; Ex. 24 at NFLP9229.)

over-licensed, and that we would eliminate certain licensees, that we didn't think could compete." (SOF 11; Ex. 89, Goodell Dep. 77:5-8.) In the fall of 2000, the NFL invited existing and potential licensees, including American Needle, to submit bids for exclusive licenses in various apparel categories to take effect in 2002.[13] It also negotiated with Nike and later Reebok over the possibility of granting a broad license or creating a joint venture to cover most NFL-licensed apparel.[14]

The terms of the NFL's request for proposals were clear. Recipients were invited to present proposals for exclusive licenses "as part of a comprehensive evaluation of [the NFL's] licensed products business." (Ex. 29, NFLP8052.) They were informed that an exclusive license model was one of "various business models for our licensed products business" under consideration, and that the NFL "reserves the right to accept or reject any or all responses." (SOF 31; Ex. 29, NFLP8052.) And the licensees were informed that although "economic considerations undoubtedly will carry great weight," other factors—including "the amount of marketing and support placed behind the NFL license"—would "also be important." (SOF 13; Ex. 29, NFLP8052.)

Prospective licensees were also required to agree to certain terms in order to participate in the bidding process. Specifically, the RFP stated as follows:

> Please be advised that, by virtue of responding to this request and participating in this process, it is expressly understood and agreed by you that NFLP reserves the right to accept or reject any or all responses to the RFP, even if all stated requirement are or are not met. . . . You further acknowledge and agree that NFLP is under no obligation to grant you, nor any other company, a license. You acknowledge and agree that NFLP's decision not to award a

---

[13] SOF 6-7, 12; Ex. 89, Goodell Dep. 31:20-33:8; Ex. 29, NFLP8052; Ex. 38 at NFLP3131.

[14] Ex. 88, Gertzog Dep. 16:6-15, 109:16-21, 111:23-113:13; Ex. 34 at NFLP8386-87.

license to your company shall not give rise to any rights in favor of
your company.

(SOF 31; Ex. 29, NFLP8052.)

███████████████████████████████████████████████

█████████        At the conclusion of the process, the NFL decided to enter into agreements with

multiple apparel licensees. Reebok received the broadest license; it received an exclusive license

for headwear and jerseys in all distribution channels, and for certain other apparel products in

some distribution channels.[15] Others awarded licenses included VF Corporation, for bottoms,

fleece, knits, and t-shirts; G-III, for outerwear; Majestic; and Haddad.[16]

Consistent with the NFL's plan to reduce significantly its licensee base, the

licenses of nine existing headwear licensees, including producers such as New Era and Twins as

well as American Needle, were not renewed. In all, the licenses of fifty apparel companies,

including such venerable manufacturers as Nike, Champion, and Majestic, were not renewed.[17]

C.      █████████████████████████

███████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

---

[15] SOF 17; Ex. 88, Gertzog Dep. 187:17-188:13; Ex. 45 at NFLP4411-12; Ex. 48 at NFLP1556,
76-77; Ex. 49 at NFLP8504.

[16] SOF 17; Ex. 88, Gertzog Dep. 188:5-12; Ex. 97, Warren Dep. 129:16-130:1; Ex. 49 at
NFLP8504; Ex. 51 at NFLP6839.

[17] *See* Ex. 9 at NFLP2214; Ex. 10 at NFLP12862; Ex. 34 at NFLP8385; Ex. 50 at NFLP9448.







In addition to minimum royalty guarantees, the RFP asked each bidder to commit a specific amount of money to be spent on marketing and brand promotion; it emphasized that "the amount of marketing and support placed behind the NFL license" would be an important factor in the evaluation. (SOF 13; Ex. 29 at NFLP8052.)





D.    American Needle's Non-Competitive Prior Performance As An NFL Licensee

Separately, because of its non-competitive prior performance as an NFL licensee, American Needle would not have received a license even if the NFL had opted for a small number of headwear licensees rather than an exclusive arrangement.  (SOF 30.)  As Mr. Gertzog testified, "had we gone [to] a model where we had exclusive licenses or even exclusive and one other it would not have been American Needle that would have received the license."  (Ex. 88, Gertzog Dep. 201:9-13.)  That testimony is amply supported by contemporaneous documents from the NFL's files.

Well before it decided to pursue an exclusive licensing model, the NFL staff had determined to "[e]liminate non-performing licensees that will never fit primary status"— specifically including "American Needle."  (Ex. 9 at NFLP2218.)  For example, a 1999 League planning document analyzed and evaluated then-existing headwear licensees and set forth a



matrix of licensees; it repeatedly identified American Needle as a "deletion" from the multiple-licensee model. (*Id.* at 2220-22.)

The same conclusion is reflected in a 2000 League evaluation that characterized American Needle as an "under-achieving licensee" with a "poor sales force." (SOF 28; Ex. 27, NFLP8035.) Mr. Gertzog testified about the basis for these conclusions: American Needle was "viewed as not being as capable a licensee as the others," including in "the design of products, the distribution, the advertising and promotion . . . [and] ability to work effectively with the licensor." (Ex. 88, Gertzog Dep. 202:1-16; *see also id.* at 198:11-199:16, 201:2-19.)

The NFL's contemporaneous documents confirm that in terms of performance, even among the headwear companies whose headwear licenses were not renewed, American Needle was not competitive. For example, in July 2000—months before the final decision to grant exclusive headwear rights to Reebok—the NFL prepared an updated strategy chart for its apparel licensing business. The chart contained four models, two of which contemplated a "master licensee" approach (*i.e.*, exclusive licenses by product category) and two of which contemplated a multiple-licensee model; *none of the four models included American Needle as a licensee*. (Ex. 25, NFLP4653.) Indeed, one model, reproduced below, contemplated *six* different potential headwear licensees, and American Needle was not among them:

| NFL Consumer Products | | | | | | | Men's Apparel Business Models |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| *Model 2 - Men's Scorched Earth* | | | | | | | |
| | | | Pro Line | | Team NFL | Game Day | [Specialty] |
| Headwear | | *1st Choice* | Nike | | New Era | New Era | Drew Pearson |
| | | *2nd Choice* | Reebok | | Twins | Twins | |
| | | *3rd Choice* | Adidas | | | Drew Pearson | |

| NFL Consumer Products | | | | | Kid's Apparel Business Models |
|---|---|---|---|---|---|
| | | | | | |
| **Model 2 - Kid's Scorched Earth** | | | | | |
| | | Pro Line | Team NFL | Game Day | [Specialty] |
| Headwear | 1st Choice | Nike | New Era | New Era | Drew Pearson |
| | 2nd Choice | Reebok | Twins | Twins | |
| | 3rd Choice | Adidas | | Drew Pearson | |

(*id.* (excerpted); *see also id.* (American Needle not identified as one of 33 "Consolidated Licensee[s]" listed in chart); Ex. 26, NFLP4569 (American Needle not included among potential headwear licensees).)

That conclusion was consistent with American Needle's sales performance prior to 2001. In the 1999 season year, for example, five headwear licensees sold more NFL headwear than did American Needle, which accounted for only 6.5 percent of sales; the top three vendors accounted for 37.6 percent, 18.1 percent, and 15.8 percent of total sales, respectively. (SOF 27; Gertzog 2013 Decl. ¶ 7 (summarizing Blitz royalty data; NFLP34946-42583).) ███████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████[28]

---

[28] Other contemporaneous documents reflect the NFL's assessment that American Needle "ha[d] a poor sales force" (Ex. 27, NFLP8035); relied on a third party distributor for a "high percentage (80%) of their volume in the mass channel," contrary to the League's policy that distributors "are set up to augment our licensees' sales efforts, not to be the primary retailer" (*id.*; *see* Ex. 11, NFLP8021); failed to comply with quality requirements, including standards for Team NFL licensed products (Ex. 3, NFLP8103); failed to comply with requirements to "differentiate between distribution channels" (*id.*); was cautioned for improper use of NFL marks (Ex. 12, NFLP9148)████████████████████████
████████████████████████████████████████ (SOF 28.)

One written assessment of American Needle in 2000 contained a stark conclusion: "Although they have filled a fashion niche in the past, other cap licensees have caught up and cater to the same customer."  (SOF 28; Ex. 27 at NFLP8035.)  In short, by the time of the bidding process in the fall of 2000, the circumstances leading to the award of previous licenses to American Needle had disappeared and, ████████████████████████████████ ██████████████████████████████ American Needle was not seen as part of the League's future licensing plans.  (SOF 28, 30.)

## ARGUMENT

### I. Undisputed Evidence Establishes That Exclusivity Was Not The Cause Of American Needle's Asserted Injury.

Since the outset of this case, American Needle has asserted that the *exclusivity* of the Reebok headwear license is "the only conduct alleged to have been unlawful."  American Needle's Response to the Motion of the NFL Defendants for Summary Judgment, Doc. 93, at 25 (Mar. 5, 2007).  There is no allegation—nor could there reasonably be an allegation—that a decision by the NFL to reduce the number of its headwear licensees to three or two would have raised an antitrust issue.  Accordingly, in order to prevail, American Needle must demonstrate that but for the *exclusive* rights granted in the Reebok headwear license, its headwear licenses from the NFL would have been renewed.[29]

---

[29] American Needle cannot claim that it was entitled to a license due to the longevity of its relationship with the NFL or its prior licenses; such a position is flatly contradicted ████████ ████████████████████████████████ by relevant legal authorities.  *See, e.g.,* ████████████████████████ *Valley Prods. Co. v. Landmark*, 128 F.3d 398, 406 (6th Cir. 1997) (authorization to sell logo-bearing items "surely gave [plaintiff] no prescriptive right to use the logos in perpetuity"); Herbert Hovenkamp *et al.*, IP AND ANTITRUST § 13.3c (2002) (no duty to continue an existing license arrangement where licensor would not be obligated to enter into a new license arrangement). ████████████████████████████████ (continued…)

As the Seventh Circuit has explained, in determining whether antitrust injury has occurred, a court "must determine whether the violation was the cause-in-fact of the [plaintiff's] injury: that 'but-for' the violation, the injury would not have occurred." *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 395, 401, 404 (7th Cir. 1993) (plaintiffs failed to prove that challenged conduct, rather than various intervening economic and market factors, caused their injuries); *O.K. Sand & Gravel v. Martin Marietta Techs.*, 36 F.3d 565, 573-74 (7th Cir. 1994) (summary judgment dismissal of antitrust claim for lack of causation).

American Needle bears the burden of proving that exclusivity is what caused its asserted injury. *Greater Rockford Energy & Tech. Corp.*, 998 F.2d at 401 ("[T]he plaintiff must establish, with a fair degree of certainty, that the [antitrust] violation was a material element of, and substantial factor in producing, the injury."). It must come forward with *evidence*, not speculation, creating an issue of material fact with respect to causation. *See Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006) ("non-moving party must come forward with specific facts showing that there is a genuine issue for trial"); *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004) ("Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion."). American Needle has not come close to meeting this burden, and undisputed facts establish that it cannot do so.

As described above, Mr. Gertzog testified, in unambiguous terms, that American Needle would not have received a license even if the NFL had chosen a multiple-licensee model; that testimony was confirmed by extensive and undisputed contemporaneous documents. (SOF 27-28, 30.) ███████████████████████████ American Needle was not

███████████████████████████████████████████████████████
██████████████.

considered a "primary" licensee that, according to the NFL's assessment, would have had a role

in its headwear licensing program under any of the business models under consideration.  (*Id.*)



In *O.K. Sand & Gravel*, Martin Marietta asserted that it was terminated as a dealer

because O.K. Sand had "entered into an illegal agreement" with another dealer "to price-fix and

monopolize the market."  *O.K. Sand & Gravel*, 36 F.3d at 573.  Although there was evidence

that O.K. Sand "was satisfied with Martin Marietta's performance," the Seventh Circuit rejected

the argument that O.K. Sand "had no other reason to terminate the agreement . . . [but to] enter

into an illegal combination."  *Id.* at 573-74.  Affirming summary judgment for O.K. Sand, the

Court held that termination of Martin Marietta's contract at the same time that O.K. Sand entered into the allegedly unlawful contract did not show that the alleged antitrust violation "was a material and substantial factor causing the[] alleged injuries" and that "other factors can easily explain why O.K. Sand terminated Martin Marietta." *Id.* at 573-74. The same reasoning applies here; undisputed evidence demonstrates that "other factors," and not the exclusivity of the Reebok license, were the "but-for" cause of the non-renewal of American Needle's licenses. (SOF 6-15, 18-30.)

American Needle has come forward with *nothing* to carry its burden of proving "with a fair degree of certainty" that it would have received a headwear license if Reebok's headwear license were not exclusive. *Greater Rockford Energy & Tech. Corp.*, 998 F.2d at 401. Despite eighteen months of discovery, there are no documents supporting American Needle's position. *See O.K. Sand & Gravel*, 36 F.3d at 573-74 (rejecting argument that because termination of plaintiff's contract was a necessary prerequisite to a new agreement, the agreement caused the termination). There is no fact testimony supporting American Needle's position. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

American Needle has not and cannot "come forward with specific facts" showing that its license would have been renewed if the NFL had not granted an exclusive headwear license; indeed, it has presented *no* such evidence. *See Keri*, 458 F.3d at 628. "Mere speculation or conjecture [to the contrary] is insufficient to create a genuine issue of material fact and survive summary judgment." *Adams v. Battaglia*, 2011 WL 2038722, at *5 (N.D. Ill. May 24, 2011) (Coleman, J.) (citing *Delapaz v. Richardson*, 634 F.3d 895, 901 (7th Cir. 2011)); *see McDonald*,

371 F.3d at 1001. Accordingly, because "the record as a whole reveals no genuine issue of material fact for trial, and the [Defendants] therefore [are] entitled to judgment as a matter of law," summary judgment is warranted. *Roger Whitmore's Auto. Servs. v. Lake Cnty., Ill.*, 424 F.3d 659, 667 (7th Cir. 2005) (citing Fed. R. Civ. P. 56(c)).

## II. American Needle Waived Any Rights That It Might Otherwise Have Had To Challenge The NFL's Decision Not To Renew Its Licenses.

In its request for proposals, the NFL included very few terms and conditions; the entire letter is barely more than a page. Prominent among the terms of the RFP was a provision that, "by virtue of responding to this request and participating in this process," the bidder "acknowledge[d] and agree[d] that NFLP is under no obligation to grant you, nor any other company, a license," and further "*acknowledge[d] and agree[d] that NFLP's decision not to award a license to your company shall not give rise to any rights in favor of your company*." (SOF 31; Ex. 29 at NFLP8052 (emphasis added).)

███████████████████████████████████████████

███████████████████████████████████████████ By doing so, it acknowledged and agreed to the terms set forth above, *i.e.*, that the NFL was "under no obligation" to grant it a license and that the NFL's "decision not to award a license" to American Needle did not "give rise to any rights in [its] favor." (Ex. 29 at NFLP8052.)

On this issue, the NFL and American Needle formed a valid contract with the requisite offer, acceptance, and consideration; the waiver was part of its terms. *Dedicated Transp., Inc. v. Volkswagen of Am., Inc.*, 2001 WL 811657, at *3 (N.D. Ill. 2001). There was an offer: the NFL's offer to consider a proposal from American Needle, subject to the NFL's stated conditions, which by their terms would be accepted "by virtue of responding to this request and

participating in this process." (SOF 31; Ex. 29, NFLP8052.) There was acceptance: ███████

████████████████████████████████████████████████ *See Landmark Props.,*

*Inc. v. Architects Int'l-Chi.*, 526 N.E.2d 603, 606 (Ill. App. Ct. 1988) ("It is well settled that a

party named in a contract may, by his acts and conduct, indicate his assent to its terms and

become bound by its provisions even though he has not signed it."); *see generally Beaver v.*

*Grand Prix Karting Ass'n*, 246 F.3d 905, 909 (7th Cir. 2001) ("assent to a contract—and that, in

essence, is what a release is—may be established by acts which manifest acceptance"). And

there was consideration ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

     This contract and its waiver provision constituted a valid and enforceable

agreement. *See generally Hampton v. Ford Motor Co.*, 561 F.3d 709, 715 (7th Cir. 2009)

(unambiguous waivers are valid and enforceable contracts, even when they contain broad

language applicable to "all claims" between parties). The claim that American Needle seeks to

pursue here falls within the clear scope of the waiver reflected in that agreement; the RFP

precludes claims based on "NFLP's decision not to award a license to your company"—the very

act that allegedly caused American Needle's injury. Hence, the waiver provision should be

applied here to bar American Needle's claim against the NFL Defendants. *See Goodman v.*

*Hanson*, 945 N.E.2d 1255, 1263 (Ill. App. Ct. 2011) (enforcing specific release to bar all claims

that fell within the scope of the release).

## **CONCLUSION**

    For the foregoing reasons, the Court should grant summary judgment for

defendants.

Respectfully submitted,

 /s/  Timothy Hardwicke
Timothy B. Hardwicke
Michael J. Nelson
LATHAM & WATKINS LLP
233 South Wacker Drive, Suite 5800
Chicago, IL  60606
(312) 876-7700/*fax* (312)993-9767
tim.hardwicke@lw.com/
michael.nelson@lw.com

*Counsel for Reebok International Ltd.*

 /s/  Derek Ludwin
Gregg H. Levy (*pro hac vice*)
Derek Ludwin (*pro hac vice*)
Leah E. Pogoriler (*pro hac vice*)
Ross A. Demain (*pro hac vice*)
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., N.W.
Washington, DC  20004
(202) 662-6000/*fax* (202) 662-6291
glevy@cov.com/dludwin@cov.com/
lpogoriler@cov.com/rdemain@cov.com

Richard Del Giudice
GOZDECKI, DEL GIUDICE, AMERICUS &
FARKAS LLP
One East Wacker, Suite 1700
Chicago, IL  60601
(312) 782-5010/*fax* (312) 782-4324
r.delgiudice@gozdel.com

*Counsel for the NFL Defendants*

April 1, 2013

## <u>CERTIFICATE OF SERVICE</u>

I, Derek Ludwin, an attorney, do hereby certify that I caused a copy of the foregoing to be electronically filed with the Court and to be served on all parties on April 1, 2013 using the Court's electronic case filing system.

By:   */s/ Derek Ludwin*
                  Derek Ludwin