**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| AMERICAN NEEDLE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 04-cv-7806 |
| | ) | |
| v. | ) | |
| | ) | Judge Sharon Johnson Coleman |
| | ) | |
| NEW ORLEANS LOUISIANA SAINTS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff American Needle was one of several companies licensed to make hats bearing the logos of National Football League teams, but lost that license when the NFL's licensing entity, NFL Properties, entered into an exclusive ten-year licensing agreement with one of American Needle's competitors, Reebok. American Needle claims that the exclusive deal with Reebok was a combination that restrained trade in violation of the Sherman Antitrust Act, and in its motion for summary judgment, contends that a violation may be found on the basis of an abbreviated review rather than a full rule of reason analysis. Defendants, who include the NFL, 30 of the league's 32 teams, NFL Properties, and Reebok, also seek summary judgment. They contend that American Needle has not made a sufficient showing of a relevant product market to sustain its Sherman Act claim, and that it cannot show any causal link between the exclusive licensing arrangement and any alleged injury. For the reasons detailed below, the motions for summary judgment are denied.

**BACKGROUND**

The teams of the National Football League license much of their intellectual property through a separate entity, NFL Properties. For more than 20 years, American Needle held licenses from NFL Properties to make and sell hats bearing the logos of NFL teams. Several other companies held similar licenses at the same time. In 2000, the league decided to grant headwear licenses on an exclusive basis, and accepted manufacturers' bids for the licensing arrangement. Reebok was the successful bidder, and in 2001, the company executed an agreement with NFL properties for a ten-year exclusive license to make and sell NFL hats. American Needle was one of several unsuccessful bidders for the arrangement; its license for NFL hats was not renewed when it expired in March 2001. American Needle then brought the present action, asserting that the exclusive arrangement with Reebok violated the Sherman Antitrust Act. Following Court of Appeals and Supreme Court review of prior motion dispositions, the claim remaining in this court is American Needle's allegation that the exclusive arrangement unreasonably restrained trade.

**ANALYSIS**

*I. Plaintiff's Motion For Summary Judgment*

Section 1 of the Sherman Act prohibits combinations that unreasonably restrain trade. *U.S. v. Brown University,* 5 F.3d 658, 668 (3d Cir. 1993), citing *Standard Oil Co. v. United States,* 221 U.S. 1, 58 (1911). Analysis of the reasonable nature of a challenged restraint generally requires a weighing of the circumstances surrounding the restraint to determine its effect on competition. *Continental T.V. Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 49-50 (1977).

However, a restraint may be determined to be a violation of the Sherman Act after an abbreviated, or "quick look" analysis if its anticompetitive effect is obvious.  *California Dental Association v. F.T.C.,* 526 U.S. 756, 770 (1999).  American Needle contends that a quick look analysis is appropriate here.

In response, defendants contend that the exclusive license arrangement encouraged additional licensee commitment and had numerous procompetitive effects, including improvements in product design, quality, distribution, and coordination of styles with other apparel items.  These contentions are sufficiently supported by evidence and expert opinion to be facially plausible.  The plausibility of the claims of procompetitive effect precludes abbreviated review of American Needle's claim.  *California Dental Association,* 526 U.S. at 778.  American Needle's motion for summary judgment is accordingly denied.

*II.  Defendants' Motion For Summary Judgment - Market Definition*

Defendants assert that they are entitled to summary judgment because American Needle has failed to provide evidence of a proper product market that is sufficient to allow its claim to reach a jury.  The court is not persuaded that such evidence is required here.

"Since the purpose of the inquires into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, proof of actual detrimental effects, such as a reduction of output, can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects."  *FTC v. Indiana Federation of Dentists,* 476 U.S. 447, 460-61 (1986) [internal citation and quotation marks omitted].  In the present case, American Needle has presented evidence that shortly following the execution of the exclusive arrangement between Reebok and NFL Properties, wholesale prices of

licensed hats rose by a significant degree while output of those items dropped, and that the higher prices and lower output continued for years, never returning to their pre-exclusivity levels. These results are the direct anticompetitive effects that the Sherman Act seeks to prevent. *Law v. National Collegiate Athletic Association,* 134 F.3d 1010, 1019 (10th Cir. 1998), *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 678 F.2d 742, 745 (7th Cir. 1982).

Defendants contend that direct proof of detrimental effects obviates the need for market definition only in horizontal action cases, and that this is a vertical action case. This contention ignores the Supreme Court's holding that despite the teams' use of NFL Properties as the single agent to implement their marketing decisions, and despite the longevity of the arrangement, the decision of each of the NFL teams to grant exclusive licenses to Reebok was horizontal action. "[D]ecisons by the NFLP regarding the teams separately owned intellectual property constitute concerted action." *American Needle, Inc. v. National Football League,* 580 U.S. 183, 201 (2010). The presence of a vertical element of restraint in the form of the NFL Properties transaction with Reebok does not negate the horizontal element recognized by the Court.

Defendants also argue that American Needle's price increase analysis failed to properly assess various factors such as the quality mix of the products sold, but these arguments can be resolved only by determining which of the parties' competing inferences and experts is more credible. Such determinations are properly made by the trier of fact. The court finds that the evidence presented by American Needle would be sufficient to support a jury finding of a less competitive market following the exclusive licensing arrangement. As a result, the court also finds that American Needle need not make a specific showing of the relevant product market to survive summary judgment.

4

In addition, to the extent that a relevant product market definition could be considered a necessary element of American Needle's Sherman Act claim, the court is unpersuaded by defendants' contention that the market advocated by plaintiff is improper. Defendants argue that plaintiff's suggested market, the wholesale market for NFL trademarked hats, is improperly narrow because NFL hats compete with various other products, including non-apparel items, hats bearing other insignia, such as the logos of teams in other sports and leagues, and hats bearing no insignia at all.

Federal antitrust analysis has long recognized that subsets of broad markets may be considered distinct markets for antitrust purposes, and has examined various factors to determine the boundaries of these submarkets. *Brown Shoe Co. v. U.S.,* 370 U.S. 294, 325 (1962). These factors include industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors. *Id.* In the present case, the parties have presented evidence that NFL Properties licensed hats separately from other apparel and that some hat distribution occurs through retail outlets focused primarily on headwear sales. Along with the self-evident distinction between the characteristics and uses of hats and those of other licensed items offered as competing products, such as sweatshirts and shot glasses, these facts provide a basis for a conclusion that hats are in a submarket distinct from other apparel and non-apparel items.

To distinguish the market for NFL team hats from hats bearing logos of teams from other sports, American Needle has presented sales data showing that NFL hat sales are seasonal, rising with the start of the league's season and with the peak of its playoff season. It has also provided

analysis purporting to show a lack of correlation between price increases for NFL hats and sales increases for other leagues' hats. Defendants argue with the validity of the analysis of American Needle's expert, but as indicated earlier, the court views this argument as raising issues not properly resolved on summary judgment.

In *National Collegiate Athletic Association v. Board of Regents of the University of Oklahoma,* 468 U.S. 85, 111 (1984), the Supreme Court found that a sports league's unique attractiveness may create a submarket for its television broadcasts that is distinct from the market for other programming, and it found that merchant willingness to pay a premium for advertising on the league's broadcasts was evidence of that unique attractiveness. The court finds that the Court's principle applies with equal force here: it is undisputed that multiple manufacturers of hats were willing to pay substantial premiums for the right to place NFL team logos on their products. This willingness indicates that hats licensed by defendants have a sufficiently unique attractiveness to prevent unadorned hats or the hats of other leagues from being ready substitutes. In the court's view, the value of any contrary explanation for these premiums is a question for the jury.

Defendants also cite *Major League Baseball Properties, Inc. v. Salvino,* 542 F.3d 290 (3d Cir. 2008) as support for rejecting a product market defined on the terms advocated by American Needle, but the *Salvino* court reviewed a record where the claims of Sherman Act violations were based entirely on the assertion that quick look analysis was appropriate and were not supported by evidence controverting Major League Baseball's defenses. The antitrust claimant in *Salvino* agreed with MLB's expansive market definition. 542 F.3d at 299-300. The *Salvino* court noted that the claimant "did not respond to MLBP's arguments regarding the rule of reason analysis,"

and cautioned: "We express no view as to what the outcome would be of a case in which a plaintiff challenging the Clubs' centralization of licensing functions in MLBP as their exclusive licensing agent adduced admissible evidence as to the reasonableness of that practice." 542 F.3d at 334. *Salvino* is thus distinguishable from the present case.

Defendants contend that American Needle's proposed market is improper because it concentrates on wholesale transactions rather than the consumer retail market. However, American Needle has offered evidence that despite the asserted wholesale price increases and output reductions that followed the exclusive Reebok license agreement, total revenue paid by consumers for NFL hats rose. The court views this evidence as sufficient indication of anticompetitive effect on consumers to fall within the purview of the Sherman Act. For the aforementioned reasons, defendants' motion for summary judgment on the basis of American Needle's claimed failure to properly demonstrate a relevant product market is denied.

### III. Defendants' Motion For Summary Judgment - Causation

Finally, defendants argue that American Needle cannot show a causal link between the Reebok contract and any damage it suffered. The initial basis for this argument is a series of contentions. Defendants assert that a contract that chose a larger but still fixed number of licensees would have been permissible under the Sherman Act, that American Needle's bid was not one of the best bids, and that its license rights would not have been renewed even in the absence of the Reebok exclusive arrangement. Defendants do not cite authority for their assertion that a less dramatic restraint, permitting as many as three licensees, would have been presumptively valid under Sherman Act analysis. Nor do defendants contend that American Needle had in any way been in breach of its earlier license agreements or that it was otherwise

disqualified from continued participation in the prior multiple-licensee approach. On this record, there is sufficient evidence to permit a jury to find that American Needle could have continued as a licensee under the traditional structure, and that its prospects were ended by defendants' concerted decision to limit the number of their licensees. The possibility that a less onerous restraint would have also ended those prospects does not negate the causal link between the alleged injuries and the restraint actually imposed.

The second prong of defendants' causation argument is that American Needle waived its claims in a document it signed in the bid process for the exclusive license. The language cited by defendants is a representation by American Needle that defendants had no obligation to grant it a license and that their decision not to award a license did not give rise to any rights in American Needle's favor. This language falls far short of a waiver of the rights American Needle asserts here, which are derived not from the bidding process or any contractual arrangement with defendants, but from the Sherman Act. The language highlighted by defendants does not waive or disclaim those rights, and does not provide a basis for a grant of summary judgment in defendants' favor. Defendants' motion for summary judgment on causation grounds is accordingly denied.

**CONCLUSION**

For the foregoing reasons, the summary judgment motions of plaintiff and defendants are denied.

So ordered.

April 4, 2014

Sharon Johnson Coleman
District Judge